# IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

RIMSI CORPORATION, )
)
    Appellant, )
)
    v. )    **C.A. No. N19A-12-006 DCS**
)
TIMOTHY MASSEY, )
)
    Appellee. )
)

Submitted: August 17, 2020
Decided: November 10, 2020

*Upon Appeal from the Industrial Accident Board–*
**AFFIRMED**

## OPINION

Joseph Andrews, Esquire and Taylor E. Trapp, Esquire, Attorneys for Appellant.
Frederick Freibott, Esquire, Attorney for Appellee.

**STREETT, J.**

## Introduction

RIMSI Corporation (the "Employer;" the "Appellant") appeals the Industrial Accident Board's decision to deny its Petition Seeking to Terminate Total Disability Benefits for Timothy Massey (the "Claimant;" the "Appellee") in relation to Claimant's work-related injuries.

The Board chose to rely on Claimant's expert over Employer's expert in finding that Claimant continues to be totally disabled from work-related injuries and denying Employer's petition. Employer appeals the Board's decision to this Court, arguing that the Board committed legal error, abused its discretion, and that its decision is not supported by substantial evidence.

For the following reasons, the Court affirms the Board's decision.

## Statement of Facts

On April 19, 2012, Claimant was involved in a work-related accident while working for Employer. Claimant, who was a maintenance person, fell down some stairs at his place of employment (the Iron Hill Apartment complex which was owned by Employer).

Between January 2014 to September 2017, Claimant underwent three cervical spine surgeries, two lower back surgeries, and one shoulder surgery. He also takes 22 prescribed narcotic pills per day for pain.

1

The parties stipulated that, as a result of the work accident, Claimant suffered compensable physical injuries (to his lumbar spine, cervical spine, and left shoulder) and that he also was suffering from depression. An Agreement as to Compensation was also attached to the stipulation specifying that Claimant was totally disabled from October 11, 2017 following surgery on Claimant's lumbar spine. The agreement was approved by the Department of Labor.

Since October 11, 2017, Claimant has been receiving $622.05 per week, based on an average weekly wage of $1,059.44.

On June 28, 2018, as part of a Defense Employee Medical Examination, a functional capacity evaluation was performed on Claimant. It determined that Claimant was capable of a part-time sedentary to light-duty job.

On November 26, 2018, Employer filed a Petition Seeking to Terminate Total Disability Benefits, contending that Claimant is able to return to work in a limited duty capacity.

In addition, Claimant also has throat cancer, prostate cancer, and a detached retina that are unrelated to the work injuries.

**Procedural History**

On September 11, 2019, a hearing was held before the Board. Employer's live witnesses were Claimant and Dr. Barbara Riley, a vocational rehabilitation counselor. Employer's deposition testimony consisted of Employer's medical

expert, Dr. Lawrence Piccioni. Claimant's live witnesses were Claimant (who testified on his own behalf) and Jose Castro, a rehabilitation counselor. Claimant's deposition testimony consisted of the testimony of Claimant's medical expert, Dr. Bruce Rudin.

Claimant, testifying as a witness for Employer, said that he is 65 years old, attended high school but did not graduate, and did not obtain a GED.[1] Claimant worked for Employer as a maintenance technician. His duties included supervising a maintenance crew, installing air conditioners, painting, drywall, and making various repairs for the Iron Hill Apartment complex.[2] Prior to working for Employer, Claimant worked as a maintenance mechanic for Mid Atlantic Corporation and as the first line supervisor of production for Zenith.[3] Claimant acknowledged that he has supervisory skills.[4]

Claimant also testified that he is currently able to do some cleaning and cooking at his home and that he is able to drive sometimes, but that his ex-wife drove

---

[1] The Board Hearing Transcript, at 9-10.

[2] *Id.* at 10-11.

[3] *Id.* at 12.

[4] *Id.*

him to the hearing.[5]  Claimant stated that he spends most of his time watching TV and taking naps to get off of his back.[6]

Additionally, Claimant testified that his computer skills[7] are limited to the use of email and he does not know how to surf the internet or how to get onto the computer.[8]  If he needs to use the computer, he asks his wife or daughter for help.[9] Claimant also has a flip cell phone.[10]

He stated that if there were jobs available to him, it is doubtful that a family member would be able to drive him to work, he only drives about five miles, and he would be willing to take public transportation if available.[11]  Claimant testified that he applied to twenty jobs online, applying for "whatever that [he] felt that would call [him] back."[12]  Claimant explained that he followed up with the potential employers

---

[5] *Id.*

[6] *Id.* at 14.

[7] *Id*. at 13.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 12-13.

[12] *Id.* at 16.

by calling them and was told that they would get back with him[13] but none of the

potential employers contacted him.[14]

Employer's counsel asked Claimant whether he wanted to work and the

following exchange occurred:

Q. Do you want to work?
A. No, I can't work. I cannot work.
Q. My question is, do you want to work?
A. No.
Q. Okay.
A. No.
Q. Do you want to retire?
A. Yes.
Q. Okay. If an employer would offer training to teaching [sic] you
skills for a job that you've never previously performed, would you be
willing to learn?
A. No, I'm not interested in working at all. I can't work at all.[15]

Dr. Riley, Employer's witness, testified that she has been working in the field

of vocational rehabilitation since 1981.[16] Employer requested that Dr. Riley perform

a job survey investigation to determine job availability within Claimant's

capabilities.[17] Dr. Riley stated that she asked to meet with Claimant but that the

---

[13] *Id.*

[14] *Id.*

[15] *Id.* at 17.

[16] *Id.* at 19.

[17] *Id.* at 19.

meeting was never authorized by Claimant's counsel.[18]  However, she stated that she was able to review Claimant's medical records and history and that she relied on Claimant's restrictions as contained in the records.[19]

Dr. Riley testified that it was her understanding that Claimant was restricted to sedentary work on a part-time basis.[20]  She testified that the functional capacity evaluation showed:

> That [Claimant] could do part time work up to six hours a day and that some of those duties also involved – some of the capabilities also include some light duty work based upon some of the lifting and carrying that he exhibited during that.  That he could work six hours a day, he could stand for two hours – up to two hours, walk from one to two hours, occasionally lift ten to 17 pounds.  Kneeling and crawling were to be avoided.  He could carry 22 pounds with his right upper extremity and 17 with the left and that he could occasionally bend, squat, climb stairs.  Occasionally use his feet for repetitive motions and also have the opportunity to change position to remain comfortable while he was working…[21]

Concerning Claimant's employment history, Dr. Riley testified that Claimant did "electrical work or something similar in maintenance," worked for a sound proofing company, worked for a company that made credit cards, delivered

---

[18] *Id.* at 20.

[19] *Id*. at 22, 24.

[20] *Id.* at 25.

[21] *Id.* at 25-26.

furniture, and did "work in all the trades."[22] She stated that Claimant's position as a supervisor would be considered a skilled position "because of the nature of the activities that he did."[23]

Dr. Riley stated that she looked for jobs that would be appropriate for Claimant in Kent County and New Castle County and that she found 22 jobs.[24] She said that many of the locations were available by public transportation, nine of the jobs were within 30 miles of Claimant's residence, and seven of the jobs were within ten miles.[25]

According to Dr. Riley, she found the jobs by searching the internet or in person.[26] She stated that she would then call the potential employers and inform them about Claimant, his restrictions, his capabilities, his education, and his work history.[27] She also stated that she went to the locations, talked to the employers about the positions, observed the jobs, and confirmed that they would accept an application from a person with Claimant's background and capabilities and give him

---

[22] *Id*. at 22-23.

[23] *Id*. at 23-24.

[24] *Id.* at 26, 28.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 27.

the same consideration as any other qualified applicant.[28]  The positions included customer service representative, surveillance officer, security guard, production sorter, host, asset protection person, sales person, coordinator, and receptionist.[29]  The average weekly wage of the positions was $246.04.[30]

Dr. Riley testified that she did not believe that anything precluded Claimant from working at any of the positions that she found.[31]  For the positions requiring computer skills, she stated that Claimant could take classes at the Dover Public Library and learn computer skills within one to two hours.[32]

On cross-examination, Dr. Riley stated that if Claimant would be unable to drive to work he could apply for impaired related work expenses ("IRWE") that would pay for the cost of specialized transportation to and from work, the cost of hiring someone to help him get ready for work in the morning, the cost of hiring a non-impaired person to do the part of his job that he would be unable to do because

---

[28] *Id.* at 27, 32-33.

[29] *Id.* at 30.

[30] *Id.* at 29.

[31] *Id.* at 33.

[32] *Id.* at 34.

of his disability, and the cost of training to learn how to use impairment-related specialized equipment.[33]

Dr. Riley also said that she told the potential employers that Claimant is on prescription medication.[34] However, she did not tell them that he takes 22 narcotic pills a day.[35]

Dr. Piccioni testified by deposition as Employer's medical expert witness and said that he is a board certified orthopaedic surgeon and certified workers' compensation provider.[36] Dr. Piccioni stated that he saw Claimant four times (September 8, 2015; July 9, 2016; June 28, 2017; and September 18, 2018).[37] He also said that he reviewed the medical records, Dr. Rudin's deposition, Dr. Riley's labor market survey, and Claimant's functional capacity evaluation.[38]

Dr. Piccioni opined that, although Claimant's subjective complaints have not improved, "objectively he had really no evidence of significant radiculopathy either upper or lower extremity when you're dealing primarily with cervical and lumbar

---

[33] *Id*. at 35-36.

[34] *Id.* at 43.

[35] *Id.*

[36] Dr. Piccioni's Deposition, at 4.

[37] *Id.* at 8.

[38] *Id*. at 8-9.

areas."[39]  He also stated that X-rays "had shown eventually, particularly in the cervical spine, healing of the areas that were treated surgically."[40]  During Claimant's most recent visit, he complained of pain primarily in the lumbar area and cervical area.[41]

During Claimant's June 28, 2017 visit, Dr. Piccioni described Claimant as ambulating with a steady gait using a walker, he could walk without the walker, and he had a slightly flexed forward posture.[42]  Dr. Piccioni stated that Claimant's "[g]ait and station were normal, hip heights were equal, no spasm of the lumbar spine, mild tenderness subjectively on the paraspinal of the lumbar area, no Gibbus deformity, no pain to percussion, no tenderness over the SI joints."[43]  In addition, Dr. Piccioni noted that the sciatic notch was negative for tenderness but that Claimant exhibited possible Waddell's signs in the seated position.[44]  He also stated that Claimant's

---

[39] *Id.* at 12.

[40] *Id.*

[41] *Id.* at 13.

[42] *Id.*

[43] *Id.* at 13-14.

[44] *Id.* at 14.

10

sensory examination was normal, he had 5 over 5 strength in all dermatomes, and there was no calf or thigh atrophy.[45]

Dr. Piccioni then issued a physical capacities evaluation concerning Claimant's return-to-work capabilities.[46] Dr. Piccioni advised the following work restrictions:

> He could work four hours. He could sit three hours, stand two hours, drive two hours. The DOT classification sedentary, which was ten-pound maximum, bending was restricted to 25 percent, twist and turning, 25 percent, repeated arm motions and above shoulder level were 75 percent each. He could not do any kneeling, squatting, crawling, or climbing. He was allowed to operate foot controls, and listed this as permanent restrictions and that he was at maximum medical improvement.[47]

On September 18, 2018, Dr. Piccioni re-examined Claimant.[48] Dr. Piccioni testified that Claimant walked using a cane, his gait was slow and steady but not antalgic, and there was no spasm of the lumbar spine.[49] In addition, Dr. Piccioni reported that Claimant had mild tenderness to palpitation to the lower lumbar area, his hip heights were equal, and his motor strength was 5 over 5 in all planes.[50] He

---

[45] *Id.* at 14-15.

[46] *Id.* at. 15.

[47] *Id.* at 16.

[48] *Id.*

[49] *Id.* at 16-17.

[50] *Id.* at 17.

11

also noted that there was no atrophy in the calf or thigh, no sciatic tension signs with the straight leg raise test, and a normal sensory examination.[51] He stated that the neurological examination showed "some very light hypoesthesia" in the lateral aspect of the calf and "some patchy hypoesthesia" on the dorsum of the foot and planter aspect of the foot.[52] Dr. Piccioni did not note any possible Waddell's sign in this examination.[53] As a result of this examination, Dr. Piccioni recommended the same work restrictions as he did in 2017.[54]

Dr. Piccioni also testified about Claimant's comorbidities.[55] He noted that Claimant has throat cancer, a detached retina, and prostate cancer.[56] He stated that these comorbidities are not related to the work accident.[57] Dr. Piccioni opined that Dr. Rudin relied on the fact that Claimant was 65 years old and had comorbidities

---

[51] *Id.*

[52] *Id.* at 17.

[53] *Id.* at 18.

[54] *Id.* at 20.

[55] *Id.* 18-19.

[56] *Id.* at 19.

[57] *Id.*

12

when placing Claimant on total disability even though these conditions were not related to the work accident.[58]

In addition, Dr. Piccioni reviewed the 22 jobs listed in Dr. Riley's labor market survey.[59] He believed that Claimant could perform all of the jobs with the possible exception of one. He noted that a position at Dover Downs required 20/20 vision and that Claimant's history of having a detached retina (a condition unrelated to the work accident) might exclude him from that position.[60]

Concerning Claimant's functional capacity evaluation, Dr. Piccioni noted that there were some minor inconsistencies but that "on the whole it would be considered a valid study."[61] Dr. Piccioni stated that the report showed that Claimant is capable of working a sedentary to light duty job between 4 to 6 hours a day, which is similar to Dr. Piccioni's findings.[62] He also pointed out that the functional capacity evaluation took into account Claimant's issues that are not related to the work accident but still found that he was capable of work.[63]

---

[58] *Id.* at 25-26.

[59] *Id*. at 22.

[60] *Id.* at 23.

[61] *Id.* at 21.

[62] *Id.* at 21-22.

[63] *Id.* at 28-29.

In conclusion, Dr. Piccioni stated that, based on the records and his examination of Claimant, it was his opinion that there is nothing related to the work accident that can keep Claimant out of work.[64]

On cross-examination, Dr. Piccioni admitted that his September 2018 examination of Claimant took between 30 to 45 minutes[65] and he did not examine Claimant's shoulder.[66] He also testified that he did not know the dosage of Claimant's narcotic medication but that Claimant should remain on narcotic medications.[67] He further admitted that he was concerned that Claimant could be driving while being prescribed narcotic medications.[68] Concerning Claimant's pain, Dr. Piccioni opined that Claimant was exaggerating.[69]

Claimant then testified on his own behalf. He stated that he recently had an ablation and that it helped but "[n]ot all the way."[70] He said that he takes narcotic

---

[64] *Id.* at 31.

[65] *Id.* at 32.

[66] *Id.*

[67] *Id.* at 34.

[68] *Id.* at 46.

[69] *Id.* at 44.

[70] The Board Hearing Transcript, at 67.

medication amounting to 22 pills a day.[71]  He is on a Lidoderm patch, takes Oxycodone three times a day, and takes, Oxycontin two times a day.[72] He also takes Skelaxin, Valium, and Voltaren topical gel.[73]

Claimant further testified that he does not sleep well and usually wakes up at 3:00 a.m. or 4:00 a.m.[74]  He said that he is only able to drive within five miles due to his neck and back issues[75] but he does not take his narcotics before driving because he fears that he will get a DUI.[76]  In addition, the weather affects his pain and it is necessary for him to use a cane to walk.[77]  He is unable to perform any tasks other than doing dishes and folding laundry.[78]

---

[71] *Id.*

[72] *Id.*

[73] *Id*. at 68.

[74] *Id.*

[75] *Id.*

[76] *Id.* at 69.

[77] *Id.*

[78] *Id*. at 70.

Claimant also stated that his condition makes him feel like a burden to other people and that he is not a man.[79] He is currently receiving psychological treatment for his injuries[80] and is on Valium for his nerves.[81]

Concerning his computer skills, Claimant testified that he is unable to log onto a computer (his daughter logs on for him).[82] He also needs his daughter to sign into his email account and he does not know his password for his computer.[83]

Claimant then described his pain.[84] He testified that he has pain in his neck, back, and shoulder every day.[85] His pain is worse in his lower back and he has radicular pain in his lower back, neck, arm, and left leg.[86] Claimant's pain becomes worse when he is active and, on a scale of 10 (with 10 feeling as if your thumb is slammed with a hammer), Claimant stated that his pain scale on a daily basis is a 6-

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.* at 70-71.

[84] *Id.* at 70.

[85] *Id.*

[86] *Id.* at 71-72.

7 in his neck; a 6 in his shoulder; and an 8 in his lower back.[87]  He said that he experienced increased pain for about four days after his functional capacity evaluation and that he could not have performed it again until about five to six days later.[88]

Claimant testified that he applied to 20 jobs at the instruction of his lawyer.[89] His daughter helped him to apply using an I-Pad, he made some follow-up phone calls after applying, and he never received any calls back.[90]  He stated that he does not think that he could work and that if he were an employer he would not hire himself.[91]  He also testified that he does not have training to be a receptionist, restaurant greeter, surveillance officer, ticket taker, fast food crew member, cash register or credit card machine operator, waiter or server, greeter at a car dealership, customer service representative, or travel planner.[92]  He also does not believe that he can work as a grounds keeper, food delivery person, or a forklift driver.[93]  He also

---

[87] *Id.* at 72-73.

[88] *Id.* at 74-75.

[89] *Id.* at 79.

[90] *Id.* at 75.

[91] *Id.* at 77.

[92] *Id.* 77-78.

[93] *Id.* at 79-80.

said that he does not want to do any of these jobs or be trained because he cannot work.[94]

Mr. Castro testified as a witness for Claimant.[95] Mr. Castro stated that he has a master's degree in rehabilitation counseling and that he has been performing vocational rehabilitation work for 58 years.[96] He reviewed Claimant's medical records, Dr. Riley's labor market survey, the Defense Medical Examination, and the functional capacity evaluation.[97] He testified that Dr. Rudin (Claimant's expert) said that Claimant is totally disabled and that Claimant's psychiatric report noted that Claimant would be unable to work due to his psychological anxiety even if he did not have physical problems.[98]

Mr. Castro also testified about the impact of a job search on Claimant and the impracticality of Dr. Riley's labor market survey.[99] He explained that:

> So when you have pain going on constantly, you're having to take large doses on medication to keep your pain somewhat controlled. You're never going to control it. When you have to take naps during the day, it just doesn't lend to someone hiring you. There is theoretical labor

---

[94] *Id.* at 80-81.

[95] *Id.* at 82.

[96] *Id.*

[97] *Id.* at 83.

[98] *Id.* at 85.

[99] *Id.* at 87.

market survey, there is the practical. Somebody could meet you in person and say yeah, I want to work. No, it's not going to happen.[100]

Mr. Castro testified that Claimant could "[a]bsolutely not" work in a customer service industry type job that was included in Dr. Riley's labor market survey.[101] Next, Mr. Castro stated that, without considering Claimant's pain and psychological problems, there were only five or six jobs in the survey that Claimant would have the experience to perform, including a ticket taker, production sorter at Goodwill, and a crew member.[102] According to Mr. Castro, Claimant has never done any type of sales job and does not have any computer skills.[103] Mr. Castro did not believe that Claimant, in his physical condition, could complete a class to learn computer skills.[104] Additionally, Mr. Castro testified that employers would always say that they would consider a person who does not have computer skills but it does not mean that they would hire such a person.[105] Mr. Castro also stated that "[m]entally [Claimant] [is] a beaten man."[106]

---

[100] *Id.*

[101] *Id.* at 88.

[102] *Id.*

[103] *Id.* at 88-89.

[104] *Id.* at 89.

[105] *Id.* Mr. Castro rhetorically asked: "Why would they hire someone as a customer service rep who has been a maintenance man his whole life and doesn't even know how to log on a computer?"

[106] *Id.*

In addition, Mr. Castro did not believe that it was practical for Claimant to take public transportation.[107] He pointed out that it would take several hours by public transportation for Claimant to get to Concord Pike (where some of the jobs on the survey are located).[108] On cross-examination, Mr. Castro admitted that he does not have personal experience with taking public transportation to Concord Pike but stated that its takes him approximately one hour and ten minutes to drive the same distance in his personal car.[109]

Mr. Castro did not believe that Claimant could be gainfully employed for any period of time.[110] He also testified that there is not a stable labor market for Claimant when his condition is considered.[111] Mr. Castro believed that the only type of employer that would hire Claimant would be a benevolent employer such as a relative or a friend who is willing to put up with Claimant's condition.[112] Mr. Castro

---

[107] *Id.* at 90.

[108] *Id.*

[109] *Id.* at 95.

[110] *Id.* at 93.

[111] *Id.* at 92.

[112] *Id.*

testified that Claimant only says that he does not want to work and wants to retire because "he's not capable of doing stuff anymore."[113]

Dr. Rudin (Claimant's medical expert) affirmed, in his deposition, that he is a medical doctor licensed in Delaware, trained in orthopaedic surgery, has a specialty in the spine, and is a certified workers' compensation specialist.[114] Dr. Rudin first saw Claimant on June 6, 2012 (about six weeks after the work accident).[115] Claimant explained that he fell down some stairs after tripping on a piece of wood and experiences substantial neck and lower back pain.[116] In total, Dr. Rudin has seen Claimant almost 50 times.[117]

According to Dr. Rudin, Claimant had moderate signs of cervical myelopathy (a severe compressive lesion of the cervical cord), which was irritating or compressing the peripheral nerve root (of the central nervous system).[118] Through his course of treatment, Claimant underwent six surgeries to the neck, left shoulder,

---

[113] *Id.*

[114] Dr. Rudin's Deposition, at 4.

[115] *Id.* at 6.

[116] *Id.* at 7.

[117] *Id.* at 12.

[118] *Id.* at 7.

21

and back (two on his lower back, three on his cervical spine, and one on his shoulder).[119]

Claimant's first surgery was an anterior discectomy and fusion at the C4-5 level.[120] On January 21, 2014, Claimant had a left shoulder arthroscopic debridement (rotator cuff repair), along with other procedures.[121] On July 31, 2014, Claimant had another surgery (to graft a portion of the spine) when it was determined that he had not healed from his anterior discectomy.[122] On March 3, 2015, he had back surgery (decompression).[123] On December 15, 2015, Claimant had fascia surgery in his neck.[124] On September 21, 2017, Claimant had a decompression procedure at the L4-5 level.[125] In addition, Dr. Rubin testified that Claimant has undergone 14 epidurals, 5 types of nerve root blocks, and 1 ablation.[126]

---

[119] *Id.* at 7-8.

[120] *Id.* at 8.

[121] *Id.* at 9.

[122] *Id*. at 9-10.

[123] *Id.* 10-11.

[124] *Id*. at 11-12.

[125] *Id.* at 12.

[126] *Id.* at 13.

Dr. Rudin believed that Claimant would not get better and that he is at "maximum medical improvement."[127] He explained that Claimant's "other medical comorbidities… sort of make him a difficult patient to heal metabolically."[128] Additionally, the fact that Claimant is "chronically on opioid medication and a chronic pain patient… preclude[s] [Claimant] from being any better than he currently is."[129]

Dr. Rudin then described his findings made during Claimant's last two visits.[130] During the February 27, 2019 visit, Claimant had a primary complaint of lower back pain (Dr. Rudin did not deal with Claimant's neck because he focused on the back).[131] The ablation did not provide Claimant with any significant relief, other than at most a 20 percent reduction in pain, and he "continued to have sharp pain in his lower back and down his left leg with numbness and tingling."[132] Dr,

---

[127] *Id.*

[128] *Id.* at 11.

[129] *Id.* at 13.

[130] *Id.* at 14.

[131] *Id.*

[132] *Id.* at 14-15.

Rudin prescribed oral steroids to Claimant and scheduled a later appointment to determine whether the ablation improves his pain.[133]

On April 10, 2019, Claimant returned to Dr. Rudin.[134] Dr. Rudin testified that his "clinical assessment at that point was that [Claimant] really wasn't any better."[135] Claimant complained about pain up to his shoulder blades.[136] Claimant also complained that his pain level was 8 on a scale 10, which Dr. Rudin noted was consistent with prior pain levels.[137]

Dr. Rubin also reviewed the notes of Dr. Cagampan[138] (who is treating Claimant for pain).[139] Dr. Cagampan's notes showed that, on March 19, 2019, Claimant complained of neck pain, low back pain, shoulder pain, and leg pain that occurs all day, is consistent, and has occurred for six years.[140] Claimant stated that he had a burning pain in his knee, neck pain shooting through his left shoulder and

---

[133] *Id.* at 15.

[134] *Id.*

[135] *Id.* at 15.

[136] *Id.*

[137] *Id.* at 15-16.

[138] The record does not reflect Dr. Cagampan's first name.

[139] *Id.* at 16.

[140] *Id.*

elbow, and an occasional tingling and numbness in his fourth and fifth fingers and his left leg.[141] The April 16, 2019 records state that that cold weather aggravates Claimant's pain in his neck and lower back, he has trouble sleeping, his daily activities are affected, and he is getting more anxious.[142] Dr. Cagampan's note concluded that Claimant is totally disabled.[143]

In addition, Dr. Rudin testified that Claimant uses Lidoderm patches and takes oxycodone (10-milligram tablets three times a day), OxyContin (40-milligrams twice a day), Skelaxin, Valium, and Voltaren topical gel.[144] He also stated that Claimant's oxycodone use is the equivalent of taking 22 Percocets a day.[145] Dr. Rubin stated that this is a lot of medication and equivalent to the amount that he would give for a week to someone who had an operation.[146] Claimant also uses a cane to walk.[147]

---

[141] *Id.* at 17.

[142] *Id.* at 19.

[143] *Id.* at 20, 33.

[144] *Id.* at 17-18.

[145] *Id*. at 18.

[146] *Id.*

[147] *Id.*

Dr. Rudin then discussed the disability status of Claimant.[148] In a disability form dated from 2015, Dr. Rudin's prognosis was that Claimant was "[c]ompletely and totally disabled from any and all gainful employment due to his pain."[149] Dr. Rudin wrote that Claimant could rarely lift less than 10 pounds and could never lift more than 10 pounds.[150] He also wrote that Claimant is limited to sitting for 30 minutes, standing for 20 minutes, and that in the total course of a day he is limited to less than two hours each for sitting, standing, and walking.[151] During an eight-hour work period, Claimant would need to lie down for up to two hours; he could not twist, stoop, crouch, climb, or reach, and he would need to take three to four unscheduled breaks a day.[152] He also wrote that Claimant would need to use a cane, his concentration is severely impacted, he would be unable to drive, and he suffered from drowsiness.[153] Dr. Rudin wrote that Claimant "has limitations that are

---

[148] *Id*. at 20.

[149] *Id.* at 24-25.

[150] *Id.* at 25.

[151] *Id.*

[152] *Id*. 25-26.

[153] *Id.* at 26.

significant in an 8-hour workday" and that he would need to miss more than four days each month.[154]

Dr. Rudin also testified that he determined that Claimant was incapable of even low-stress jobs, his emotional and physical impairments are reasonable and consistent with his symptoms and functional limitations, and that he classified Claimant as "totally out of work."[155]

Dr. Rudin stated that he has had Claimant on total disability following his first surgery.[156]   In addition, Dr. Rudin stated that he wrote that Claimant was permanently totally disabled.[157]   In response to the functional capacity evaluation that determined that Claimant could perform part-time sedentary work, Dr. Rudin stated:

> So I think that that functional capacity might give you a viewpoint as to what the guy is capable of doing once over a couple-hour period, but it doesn't really actually mean that I would release him to work -- I just wouldn't release him to work.[158]

---

[154] *Id.* at 27.

[155] *Id.*

[156] *Id*. at 28.

[157] *Id.* at 29.

[158] *Id.* at 32.

On cross-examination, Employer's counsel asked Dr. Rudin about the relationship between Claimant's cancer and his total disability.[159] The following exchanged took place:

> Q. Doctor, if we took out the cancer diagnosis that you talked about, would you believe he would be able to work?
> A. No, I don't think the cancer is what makes him bad; I think it's the surgeries, his spine injuries, and the medications that he's on.
> Q. And when you say medications that he's on, you're excluding any medications for cancer, right?
> A. Well, the medications he's taking aren't for cancer; his prostate doesn't hurt and he's sort of over his neck surgery, other than the fact that he's hoarse.
> Q. So he's not taking any medication for cancer, right?
> A. He's not taking -- the medications that we spoke about are not for cancer; they are all related to his spine.
> Q. And those are the only ones you say would keep him out of work?
> A. Yes. I mean, he might be on medication for his prostate, but that wouldn't be negatively impacting his ability to work.[160]

Dr. Rudin also testified that, despite Dr. Riley's labor market survey,[161] "I don't believe he's capable of working any job… I don't think he can work."[162] However, Dr. Rudin then stated that he has not restricted Claimant's home activities.[163]

---

[159] *Id.* at 34.

[160] *Id.* at 35.

[161] *Id.*

[162] *Id.*

[163] *Id.* at 36.

On November 26, 2019, the Board issued its decision in favor of Claimant.

The Board stated that:

> In a total disability termination case, the employer is initially required to show that the claimant is not completely incapacitated. In response, the claimant may rebut that showing, show that he or she is a *prima facie* displaced worker, or submit evidence of reasonable efforts to secure employment that have been unsuccessful because of the injury. The employer would then have the burden of showing the availability of regular employment within the claimant's capabilities.[164]

After weighing the evidence, the Board found "that the Employer has failed to meet its burden to prove that Claimant is physically capable of working in some capacity."[165] The Board relied "on the opinion of Dr. Rudin over that of Dr. Piccioni and [found] that Claimant continues to be totally disabled from the competitive labor market."[166] The Board explained that:

> …Dr. Rudin has been treating Claimant since 2012 and has seen Claimant over fifty times, which provides him with significantly more first-hand knowledge of Claimant's physical condition and capabilities in relation to his work injuries than Dr. Piccioni. The Board therefore gives Dr. Rudin's opinion about Claimant's work capabilities significant weight.
>
> …
>
> According to Dr. Rudin, Claimant is now a chronic pain patient who takes a large amount of opioid medications and other medications related to his work injuries. Dr. Rudin does not believe Claimant will get any better and has reached maximum medical improvement.

---

[164] The Board's Opinion, at 17.

[165] *Id.* at 21.

[166] *Id.* at 18.

Dr. Rudin insisted that Claimant is really nonfunctional and is not capable of working in any capacity.[167]

In addition, the Board noted that Dr. Rudin's decision to place Claimant on disability was consistent with Dr. Cagampan's (Claimant's pain management physician) decision to place Claimant on total disability.[168] Furthermore, the Board found that Claimant's testimony, describing his high levels of daily pain in his neck, back, shoulder, and leg, supports the Board's conclusion that he is totally disabled from work.[169] The Board also pointed out that Mr. Castro did not believe that Claimant could work because he takes large doses of narcotic medications and has to take naps during the day.[170]

The Board also rejected Employer's contention that Claimant should be excluded from total disability benefits because he testified that he wants to retire.[171] The Board noted that Claimant has been on total disability since the work accident, he has never returned to work, he is not able to work because of his injuries, and his

---

[167] *Id*. at 18-20.

[168] *Id*. at 19.

[169] *Id*. at 20.

[170] *Id.*

[171] *Id.* at 21.

injuries are related to his work accident.[172]  In addition, the Board found that Claimant's statement that he wants to retire is motivated, at least in part, by "his inability to return to productive work activities due to the work injuries."[173]

The Board also considered whether Claimant's comorbidities were a cause of Claimant's inability to work[174] and found that there is little evidence that Claimant's throat cancer, prostate cancer, and detached retina have affected his ability to work or motivated his statement that he wants to retire.[175]

On December 19, 2019, Employer filed an appeal of the Board's decision to this Court.

On June 22, 2020, Employer submitted its Opening Brief.

On July 13, 2020, Claimant submitted his Answering Brief.

On July 20, 2020, Employer submitted his Reply Brief.

### Parties' Contentions

Employer suggests that the Board's decision in favor of Claimant was, in part, the product of the Board's hostility towards Employer.  Employer writes that the Board "showed a capricious disregard for competent evidence in the record and

---

[172] *Id.* at 22.

[173] *Id.*

[174] *Id.*

[175] *Id.*

failed to provide the appropriate analysis based on that record out of apparent hostility toward Employer's position overall."[176]

Employer first argues that Claimant is not entitled to workers' compensation because he, allegedly, removed himself from the workforce, pointing out that Claimant testified that he does not want to work and that he wants to retire. Additionally, Employer argues that there is no testimony by Claimant that his lack of desire to work is based on the industrial accident. Employer contends that, due to Claimant's testimony, the Board's decision is arbitrary and capricious.

In addition, Employer argues that Claimant "literally testified that he purposefully applied for jobs that he knew he could not perform in an effort to self-sabotage the entire process."[177] According to Employer, "in order to rebut Dr. Piccioni's testimony that he was medically employable, Claimant was required to "prove that he was a displaced worker by showing that he conducted a reasonable job search but no one would hire him due to his physical restrictions from the industrial accident."[178] Instead, Employer asserts, Claimant testified that he knowingly applied for jobs that he would be unable to perform.

---

[176] Employer's Opening Brief, at 35. Although Employer accuses the Board of hostility against Employer's position, Employer does not articulate this contention or provide concrete support for it.

[177] *Id*. at 37.

[178] *Id*.

Moreover, Employer argues that the Board committed legal error by relying on Claimant's experts' testimonies. In addition, Employer asserts that the Board's decision lacks substantial evidence.

Furthermore, Employer states that the Board "attempt[ed] to couch its decision by relying on Jose Castro['s]" testimony when he stated that "Claimant wants to retire because he does not believe he is capable of doing any job anymore."[179] Employer argues that it was "arbitrary and capricious" for the Board to rely on Mr. Castro's testimony because "Mr. Castro cannot testify about the mental impressions" of Claimant and because "Mr. Castro is not a psychiatrist."[180]

Employer also points out that Mr. Castro agreed that there were five or six jobs (out of the twenty-two listed by Dr. Riley) that Claimant could perform except for Claimant's psychological issues. As such, Employer asserts that the Board was presented with "Dr. Piccioni, Dr. Riley and Claimant's own expert Mr. Castro unanimously testifying that Claimant could return to work in at least some of the jobs provided by Employer's labor market survey."[181]

Additionally, Employer contends that the testimony of Claimant's expert, Dr. Rudin, should be discounted. Employer accuses the Board of "attempt[ing] to

---

[179] *Id*. at 37.

[180] *Id.* at 37-38.

[181] *Id*. at 38.

bolster Dr. Rudin by stating that he found total disability to exist exclusively because of the industrial accident and nothing else."[182]  Employer states that the Board's bolstering of Dr. Rudin "is not borne out by Dr. Rudin's own testimony."[183] Employer writes: "Dr. Rudin blamed Claimant's inability to work on such factors as he is 65 years old, has prostate cancer and has throat cancer," which are not part of the work accident.[184]

Employer also writes that, "while Claimant may still complain about pain, the evidence in the record shows that he actually is doing better now than he did when he previously stipulated that he could return to work in 2017."[185]

Claimant asserts that the Board clearly noted that Claimant was totally disabled and was receiving total disability since October 11, 2017.  Claimant also notes that at the time of the accident he was "well below the standard retirement age," there is no evidence that he had plans of retiring before the accident, and he explained that he is not interested in working because he believes that he is incapable of working due to his work injuries.[186]

---

[182] *Id.* at 39.

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] Claimant's Answer, at 26.

Claimant also points out that Dr, Rudin and Mr. Castro both "repeatedly testified that Claimant was permanently and totally disabled and unable to work in any capacity due to his workplace injuries."[187] In addition, Claimant argues that neither Dr. Rudin nor Mr. Castro believed that Claimant could work due to his mental and emotional state related to his work injuries.

Moreover, Claimant contends that the fact that he filled out approximately twenty job applications demonstrates that he had not voluntarily left the workplace. He claims that he filled out the applications "despite not believing he met the qualifications."[188] Claimant argues that due to the fact that Claimant was unable to perform work in any capacity, any job application he submitted could be deemed an unreasonable search. Therefore, Claimant states, the Board rightfully did not allow Claimant's job search to have any bearing on its decision.

In addition, Claimant contends that the Board's acceptance of Dr. Rudin's testimony is supported by substantial evidence. Claimant explains that the Board was free to accept the testimony of Dr. Rudin over Dr. Piccioni's testimony. In making its finding, the Board pointed out that Dr. Rudin had seen Claimant over fifty times since 2012 but Dr. Piccioni had only seen Claimant four times in four

---

[187] *Id.* at 27.

[188] *Id.*

years. Moreover, Claimant states that Dr. Rudin's opinion was consistent with the findings of Claimant's pain management physician, Dr. Cagampan.

Following Claimant's Answer, Employer submitted a Reply.[189] Employer purports that the Board erroneously considered Claimant's comorbidities when determining Claimant's disability status. Employer quotes the Board's statement that "the Board recognizes that Claimant has co-morbidities that could affect his ability to work and should therefore be considered in the Board's analysis."[190] Employer suggests that the Board considered Claimant's co-morbidities *in support* of its determination that Claimant was totally disabled. Employer argues that the Board "erred as a matter of law when they considered the co-morbidities, such as his throat and prostate cancer, when they determined that he is totally disabled as defined under the laws of workers' compensation."[191]

Employer also writes that "Claimant's expert, Dr. Rudin, testified under oath during his deposition for this hearing that Claimant remains out of work for conditions unrelated to the industrial accident."[192] Additionally, Employer states that its expert, Dr. Piccioni, "also pointed out that Dr. Rudin's decision to keep

---

[189] Employer's Reply.

[190] *Id*. at 6, quoting the Board's Opinion.

[191] *Id*.

[192] *Id*. at 5.

Claimant out of work has nothing to do with the industrial accident for which this Employer is responsible."[193]

Moreover, Employer maintains that the Board erred as a matter of law when it decided that Claimant did not voluntarily retire. Employer contends that Delaware law excludes a claimant from receiving wage replacement benefits if that claimant voluntarily withdrew from the labor market "for reasons unrelated to the work accident."[194]

Employer asserts that the Board is required to consider three factors when determining whether a claimant voluntarily withdrew from the labor market: "(1) claimant's efforts at finding other employment; (2) the claimant's age; and (3) whether a claimant has another source of income" (Employer cites to a prior Board decision as the source for these factors).[195] Defendant states that the Board did not apply these factors and that the factors, when applied, favor Employer's position. Employer argues that Claimant made no effort to find a job within his work restrictions; Claimant is 65 years of age, which is older than the average retirement age in the United States; and that Claimant has another source of income (social security benefits).

---

[193] *Id.*

[194] *Id.* at 8.

[195] *Id.* at 9, citing *Archangelo v. State*, No. 1389452, at 4 (Del. I.A.B. 2016).

Moreover, Employer contends that Claimant has chosen a "retirement lifestyle."[196]   Employer writes that "Claimant is collecting social security and chooses to spend most of his days on his couch watching television."[197]   Employer also writes:

> Receiving your main source of income from social security and choosing to spend your days lounging around the house suggest that Claimant has chosen a "retirement lifestyle" and does not wish to return to work.[198]

## **Standard of Review**

This Court's review of the Board's decision is "limited to examining the record for errors of law and determining whether substantial evidence supports the Board's factual findings."[199]   Questions of law are reviewed *de novo*.   Substantial evidence means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[200]   Substantial evidence "requires less than a preponderance of the evidence, but more than a mere scintilla."[201]   This Court is

---

[196] *Id.* at 11.

[197] *Id*.

[198] *Id.*

[199] *Blair v. Smyrna School District*, 2019 WL 1530127, at *3 (Del. Super. Apr. 5, 2019).

[200] *Id.*

[201] *Gregg v. State*, 2016 WL 4530614, at *4 (Del. Super. Aug. 29, 2016) (internal quotation marks removed).

precluded from weighing the evidence, determining questions of credibility, or making its own factual findings,[202] and it "must consider the record in a light most favorable to the party prevailing below."[203] The Court will affirm the Board's decision if it is supported by substantial evidence and is free from legal error "even if the Court might have, in the first instance, reached the opposite conclusion."[204]

## Discussion

Employer makes several meritless arguments to support its position that the Board's decision should be reversed. Employer contends that the Board disregarded competent evidence and was motivated by hostility against Employer's position; the Board abused its discretion by relying on Claimant's experts over its own experts; and that the Board's decision that Claimant is totally disabled was not supported by substantial evidence.

Employer also asserts that Claimant is not eligible for disability benefits because he voluntarily removed himself from the workforce; the Board did not apply the correct standard when determining whether Claimant voluntarily withdrew from the labor market; and that Claimant did not show that he conducted a reasonable job search.

---

[202] *Stevens v. State*, 802 A.2d 939, 944 (Del. Super. May 23, 2002).

[203] *Weitzel v. State*, 2016 WL 4249766, at *5 (Del. Super. Aug. 9, 2016).

[204] *Id.*

39

Employer further contends that the Board arbitrarily and capriciously relied on testimony about mental impressions to determine that Claimant wants to retire due to the work injuries; the Board erroneously considered Claimant's comorbidities when determining that Claimant was totally disabled; and that Claimant's expert disabled Claimant for conditions unrelated to the work accident.

For the following reasons, the Court finds no merit in any of Employer's contentions and affirms the Board's decision.

The Court finds no merit in Employer's argument that the Board "showed a capricious disregard for competent evidence in the record and failed to provide the proper analysis based on that record out of hostility toward Employer's position overall."[205] Although Employer accuses the Board of hostility, Employer does not provide any examples, and the record does not reflect that the Board was hostile towards Employer or Employer's position.

In addition, the Broad's decision (that Claimant was totally disabled) was based on competent evidence in the record – the testimony of Dr. Rudin. "[I]t was the proper function of the [B]oard to resolve any conflicts in the factual evidence presented to it."[206] It is also settled law that the Board may accept the opinion

---

[205] Employer's Opening Brief, at 35.

[206] *Hellstern v. Culinary Services Group*, 2019 WL 460309, at *11 (Del. Super. Jan. 31, 2019) (internal quotation marks removed).

40

testimony of one expert over another.[207] Here, the Board was required to resolve the conflict in testimony between the medical experts and it was resolved by accepting the testimony of Dr. Rudin over the conflicting testimony of Dr. Piccioni. Additionally, the Board provided its reasoning, explaining that Dr. Rudin has treated the patient more extensively and is more familiar with the patient's condition.

Furthermore, the Delaware Supreme Court has held that "[t]he [Board] is free to adopt the opinion testimony of one expert over another, and that opinion, if adopted, will constitute substantial evidence for purposes of appellate review."[208] Therefore, in adopting Dr. Rudin's opinion testimony, the Board's decision was supported by substantial evidence for the purposes of this review.[209]

In addition, the Board found that Claimant's testimony describing his pain and condition supported its decision. The law is clear that "[i]t is within the exclusive

---

[207] *Bolden v. Kraft Foods*, 2005 WL 3526324, at *4 (Del. Dec. 21, 2005). *See also Steppi v. Conti Electric, Inc.*, 2010 WL 718012, at *3 (Del. Mar. 16, 2010) ("It is well-settled law that the Board may accept the opinion testimony of one expert while summarily disregarding the opinion testimony of another expert.").

[208] *Reese v. Home Budget Center*, 619 A.2d 907, 910 (Del. Dec. 23, 1992) ("The Board, of course, was free to choose between the conflicting diagnoses of [one physician and another physician] and either opinion would constitute substantial evidence for purposes of appeal."); *DiSabatino Bros., Inc. v. Wortman*, 453 A.2d 102, 106 (Del. Nov. 26, 1982) (holding that where "the evidence [is] definitely in conflict and, the substantial evidence requirement being satisfied either way, the Board [is] free to accept the testimony of [one medical expert] over contrary opinion testimony.").

[209] *Hellstern v. Culinary Services Group*, 2019 WL 460309, at *11 (Del. Super. Jan. 31, 2019) ("When the Board adopts one expert's opinion and testimony over the other, the Board is not required to support its decision on more than the expert's testimony and opinion that is supported by other medical testimony and by the Board's evaluation of the claimant's credibility").

purview of the Board to determine and weigh the credibility of witnesses and the Court will not disturb these findings."[210] Moreover, this Court is required to give "considerable deference" to the Board's decision and will reverse it "only when there is *no* satisfactory proof in support of a factual finding of the Board."[211]

The Court also does not find merit in Employer's contentions that Claimant voluntarily withdrew from the workforce when he said that he wants to retire. The Delaware Supreme Court has explained that "if… an employee's retirement decision was motivated by a work-related injury that affected that employee's ability to find a comparable job, that injury has diminished the employee's earning power and thereby entitles the employee to worker's compensation benefits."[212]

Here, the Board found that Claimant's statement that he wants to retire was related to his work injury, which the Board found rendered him totally disabled. The Board's finding is supported by the record. Claimant testified that he did not want to work because he "cannot work."[213] When questioned whether he wants to retire, Claimant said "yes," and then he explained that he is not interested in working

---

[210] *Anderson v. General Motors Corp.*, 2002 WL 233747, at *1 (Del. Super. Jan. 29, 2002).

[211] *Christiana Care Health Services v. Davis*, 127 A.3d 391, 394-95 (Del. Nov. 3, 2015) (emphasis in the original).

[212] *Estate of Jackson v. Genesis Health Ventures*, 23 A.3d 1287, 1290 (Del. 2011).

[213] Broad Hearing Transcript, at 17.

because "[he] can't work at all."[214] Dr. Rudin made clear that Claimant cannot work due to the neck, spine, and shoulder injuries, and the medications treating the resulting pain, which are undisputedly related to the work accident.[215] This Court is precluded from making its own factual finding and weighing of evidence. The Board's fact finding on this issue must stand.[216]

Also, the Court finds no merit in Employer's argument that the Board was required to consider the "(1) claimant's efforts at finding other employment; (2) the claimant's age; and (3) whether a claimant has another source of income."[217] The only source that Employer provides for this standard is an unpublished Industrial Accident Board decision. In contrast to Employer's assertion, this Court finds that the Board properly followed case law by recognizing that a claimant, who has retired, is entitled to benefits if that claimant demonstrates that the decision to retire was motived by a work-related injury.[218]

So too, Employer's argument that Claimant did not conduct a reasonable job search is meritless. The Board found that "Claimant did apply for jobs identified on

[214] *Id.*

[215] Dr. Rudin's Deposition, at 35.

[216] *Stevens v. State*, 802 A.2d 939, 944 (Del. Super. May 23, 2002).

[217] *Archangelo v. State*, No. 1389452, at 4 (Del. I.A.B. 2016).

[218] *Mladenovich v. Chrysler Group, L.L.C.*, 2011 WL 379196, at *4 (Del. Super. Jan. 31, 2011).

the labor market survey but has not heard back for any of the employers."[219] In fact, the Board found that Claimant "made phone calls to follow up on the jobs but has never heard back."[220]

Moreover, Claimant was only required to show that he made a reasonable job search effort if Employer first met its burden of demonstrating that Claimant is no longer incapacitated due to the work injury.[221] Here, the Board held that "Employer has failed to meet its burden to prove that Claimant is physically capable of working in some capacity."[222]

Similarly, Employer's argument that the Board arbitrarily and capriciously relied on Mr. Castro's mental impressions in relation to Claimant's retirement statement also fails. As explained above, the Board found that Claimant's statement that he wanted to retire was motivated by his work injuries, and Claimant's own testimony that he wants to retire because he cannot work supports this conclusion.

---

[219] *Id.* at 3.

[220] *Id.*

[221] *Williams v. State*, 2009 WL 1638615, at *2 (Del. Super. Ct. May 28, 2009) ("In order to prevail on a petition to terminate benefits, the employer must demonstrate that the claimant is no longer totally incapacitated due to the work-related injury. If the employer is able to make such a showing, the burden shifts to the claimant to demonstrate that he or she is a displaced worker. This requires the claimant to show that, after a reasonable job search, the claimant was unable to find work due to his or her injuries. If the claimant successfully proves this, the burden returns to the employer to show that jobs exist within the claimant's physical limitations.").

[222] *Id.* at 21.

Additionally, there is support in the record that Mr. Castro's testimony is based on his personal knowledge, and not merely on mental impressions. Mr. Castro testified that he met Claimant twice and spoke with him once more. Mr. Castro testified that Claimant said that he (Claimant) should retire "only because he's not physically capable of doing stuff anymore."[223] To the extent that Employer suggests that the Board is not allowed to rely on such evidence, this Court has held that the Board "is not strictly bound by the technical rules of evidence" and that "[t]he evidentiary rules applicable to a hearing before the Board are significantly more relaxed that those that apply" to this Court.[224] Indeed, "[a]ll evidence which could conceivably throw light on the controversy should be heard."[225]

Moreover, Employer's argument that the Board erroneously considered Claimant's comorbidities when determining that Claimant was totally disabled is misleading. The Board's statement that it "recognizes that Claimant has co-morbidities that could affect his ability to work and should therefore be considered in the Board's analysis" clearly did not mean that the Board found Claimant to be totally disabled, in part, *on the basis of his cancer*, as Employer seems to be

---

[223] *Id.*

[224] *Smith v. R.A.M. Construction Company*, 2010 WL 3946283, at *3 (Del. Super. Sept. 29, 2010) ("[T]he evidentiary rules regarding hearsay are relaxed before administrative agencies.").

[225] *Id.*

suggesting. Instead, the Board necessarily considered whether Claimant's non-work accident comorbidities played a role in preventing him from working (because Claimant would not have been entitled to disability benefits if it was his cancer that prevented him from working). After necessarily considering the comorbidities, the Board properly found that "[t]here is no medical testimony asserting that Claimant is totally disabled from work because of these non-work-related conditions."[226]

So too, contrary to Employer's argument, the Board found, and the record supports, that Dr. Rudin disabled Claimant based on Claimant's work-related injuries and not based on his throat cancer and prostate cancer. Dr. Rudin testified that Claimant was disabled due to the work-related injuries (and the surgeries and medications related to those injuries) and that Claimant's cancer did not prevent him from working.[227]

Furthermore, the Board found that Claimant's medications, along with his pain and the impact of his surgeries, have prevented Claimant from working.[228] The Board noted that the evidence shows that Claimant takes "a large amount of opioid

---

[226] The Board's Opinion, at 21.

[227] Employer's counsel asked Dr. Rudin the following question: "Doctor, if we took out the cancer diagnosis that you talked about, would you believe he would be able to work?" Dr. Rudin's Deposition, at 35. Dr. Rudin replied: "No, I don't think the cancer is what makes him bad; I think it's the surgeries, his spine injuries, and the medications that he's on." *Id.* Dr. Rudin also explained that "the medications he's taking aren't for cancer." *Id.*

[228] *Id* at 21.

pain medication and other medications related to his work injures" and that Dr. Rudin testified that Claimant's total disability is attributable to his severe pain level and medications.[229] The Board also accepted Mr. Castro's testimony that Claimant's large doses of pain medications would make it impractical for Claimant to work.[230]

Moreover, the Board made findings of fact that would refute Employer's claim that Claimant is lounging around his house and enjoying a retirement lifestyle. The Board found that Claimant is a "chronic pain patient" who continues to have "high levels of daily pain in his neck, back, and shoulder as well as radicular pain to the left leg."[231] In fact, Dr. Rudin testified that Claimant's pain level measures eight out of ten on a consistent basis. The Board also found that Claimant's "pain levels increase as his activity increases" and that he is, therefore, limited to engaging in minimal activities around the house.[232]

---

[229] *Id.* at 19.

[230] *Id.* at 20. Mr. Castro testified that Claimant's medications would affect his performance at work because it could make him drowsy. The Board Hearing transcript, at 90.

[231] *Id*. at 19-20.

[232] *Id.*

## Conclusion

Accordingly, for the foregoing reasons, the Board's decision is **AFFIRMED**.

   **IT IS SO ORDERED**.

            */s/ Diane Clarke Streett*_____
            Diane Clarke Streett, Judge